```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
KENNETH SATTERFIELD,               :    14 Civ. 0627 (JCF)
                                   :    14 Civ. 3374 (JCF)
          Plaintiff,               :
                                   :         MEMORANDUM
     - against -                   :         AND  ORDER
                                   :
JESUS M. MALDONADO and LINDEN      :
YELLOW CAB INC.,                   :
                                   :
          Defendants.              :
- - - - - - - - - - - - - - - - - -:
PAUL VANEDEN,                      :
                                   :
          Plaintiff,               :
                                   :
     - against -                   :
                                   :
LINDEN YELLOW CAB, INC., JESUS     :
M. MALDONADO, ESTATE OF ELMA       :
SATTERFIELD, AND KENNETH           :
SATTERFIELD,                       :
                                   :
          Defendants.              :
- - - - - - - - - - - - - - - - - -:
```
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

This is a personal injury action arising out of a motor vehicle accident and is before this Court on the basis of diversity jurisdiction. Defendants Jesus M. Maldonado and Linden Yellow Cab, Inc. (the "Linden defendants") now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and seek dismissal of plaintiff Paul Vaneden's[1] complaint with prejudice, on the grounds that Mr. Vaneden failed to sustain a "serious injury" as required by New York's Comprehensive Motor Vehicle Insurance Reparations Act, N.Y. Ins. Law §§ 5101 et. seq.

---

[1] I refer to Mr. Vaneden as the plaintiff here as only his claims are at issue in the pending motion and cross-motion for summary judgment.

1

(the "No-Fault Law").   Kenneth Satterfield has cross-moved for summary judgment against the plaintiff on the same grounds.   The parties have consented to my jurisdiction for all purposes in accordance with 28 U.S.C. § 636(c).  For the reasons that follow, the motions are granted.

Background

A. Facts

On March 1, 2012, Mr. Vaneden was a passenger in the front seat of Mr. Satterfield's vehicle when an accident occurred at around 8 p.m.  (Deposition of Paul Vaneden dated Jan. 9, 2015 ("Vaneden Dep."), attached as Exh. S to Declaration of Lindsay J. Kalick dated June 15, 2015 ("Kalick Decl."), at 5, 21-22).[2]  Mr. Vaneden and Mr. Satterfield were traveling north on Randall Avenue in the Bronx when a yellow cab hit the front driver's side of their vehicle.  (Vaneden Dep. at 28, 37-38).  The plaintiff alleges that Mr. Maldonado was driving the cab in question with the knowledge and consent of Linden Yellow Cab, Inc., the owner of the vehicle. (Amended Verified Complaint ("Am. Compl."), ¶¶ 8-10).   Mr. Vaneden's claim of having sustained a serious injury appears to revolve around continuing pain in his right knee, neck, and back, which "occur[s] most of the time," and related injuries, which he has been advised "are permanent in nature."  (Affidavit of Paul Vaneden  dated July 10, 2015 ("Vaneden Aff."), attached as Exh. I to Declaration of Neil R. Kafko dated July 14, 2015 ("Kafko

--------

[2] Unless otherwise indicated, citations to the record are to the docket in Satterfield v. Maldonado, No. 14 Civ. 0627.

Decl."), at 2).

Mr. Vaneden testified in his deposition that after impact with the cab, his right leg "kind of twisted and hit the dashboard or the glove compartment" of Mr. Satterfield's vehicle and that he was "shaken up" but "semi-conscious." (Vaneden Dep. at 39). Both he and Mr. Satterfield were removed from the car by onlookers, after which an ambulance and the police arrived at the scene of the accident. (Vaneden Dep. at 40, 49). Mr. Vaneden told the paramedics that he "felt pain in his right knee, neck and back." (Defendants' Local Rule 56.1 Statement of Undisputed Fact ("Def. 56.1"), ¶ 3). He was given a neck brace, placed on a stretcher, and taken by ambulance to Jacobi Hospital, where he received a CAT scan of his head. (Vaneden Aff. at 1; Def. 56.1, ¶ 3; Report of Gerald F. Gaughan, M.D., dated June 17, 2015 ("Gaughan 6/17/15 Report"), attached as part of Exh. E to Kafko Decl., at 1). He was released later that evening. (Def. 56.1, ¶ 3).

Although Mr. Vaneden was unsure of the next time he sought medical treatment following the accident, records indicate that he began a course of physical therapy in March or April of 2012. (Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Pl. 56.1"), ¶ 4; Gaughan 6/17/15 Report at 1). The plaintiff continued physical therapy with Dr. Gerald Gaughan for a number of months; he testified that he did so for "about a year or so" but the records submitted indicate that his last appointment was in October 2012. (Vaneden Dep. at 58-59, 73-74; Pl. 56.1, ¶ 5; Followup Evaluation of Paul Vaneden dated October

18, 2012 ("Gaughan 10/18/12 Report"), attached as part of Exh. E to Kafko Decl., at 4).   His treatment included massage, range of motion exercises, electrical stimulation, and chiropractic treatment for his right knee, neck, and back. (Vaneden Dep. at 59; Pl. 56.1, ¶ 5).  Mr. Vaneden had magnetic resonance imaging ("MRI") of his right knee and lumbar spine in August 2012, which found, among other things, tears above the medial and lateral meniscus of his right knee.   (Affirmed MRI Report of Narayan Paruchuri, M.D. ("Paruchuri MRI Report"), attached as Exh. F to Kafko Decl., at 3; Affirmed MRI Report of Ronald Wagner, M.D. ("Wagner MRI Report"), attached as Exh. G to Kafko Decl.).

In March 2014, Chris Moros, D.O., performed right knee arthroscopic surgery on Mr. Vaneden.  (Pl. 56.1, ¶ 6; Affirmed Reports of Chris Moros, D.O. ("Moros Report"), attached as Exh. H to Kafko Decl., at 2).  The plaintiff was discharged after the surgery, but subsequently used a cane for a few weeks and then transitioned to using a brace, which he continues to wear approximately twice per month.   (Vaneden Dep. at 66-68). Following the surgery, Mr. Vaneden saw Dr. Moros for physical therapy and continues to see him for monthly evaluations. (Moros Report at 2; Vaneden Dep. at 68).   He also received a corticosteroid injection in his right knee in May 2014 for post-operative discomfort and persistent pain.  (Moros Report at 2). Dr. Moros told the plaintiff that an MRI performed after the surgery "did not find any further tearing or problems in his right knee." (Def. 56.1, ¶ 8).  As of July 14th, the plaintiff had not

4

attended physical therapy for his right knee in 2015.  (Pl. 56.1, ¶ 9).

In June 2014, Mr. Vaneden began experiencing pain in his left knee, where he had undergone anterior cruciate ligament ("ACL") surgery in 2007.  (Moros Report at 2; Vaneden Dep. at 12-13).  After an MRI of the plaintiff's left knee in October 2014, Dr. Moros told him that the knee was "torn," which often happens a number of years after ACL surgery.  (Vaneden Dep. at 70-71; Pl. 56.1, ¶ 7).  Mr. Vaneden elected to not have another surgical procedure and was prescribed continued physical therapy and bracing.  (Moros Report at 2; Vaneden Dep. at 70-71).  He continues to experience periodic "stabbing pain" in his right knee and pain in his neck and lower back, for which he takes Vicodin.[3]  (Vaneden Dep. at 76-77, 79-80).

The plaintiff testified that in an automobile accident in 2007, he injured his back and left knee, and required ACL surgery as a result.  (Vaneden Dep. at 12-13, 16).  In 2012, he was involved in an altercation with the police, during which he "was thrown on the floor and kind of roughed up and stepped on in [his] stomach area."  (Vaneden Dep. at 78; Def. 56.1, ¶ 12).  Mr. Vaneden

---

[3] The plaintiff testified in his deposition and stated in his affidavit that Dr. Gaughan still prescribes Vicodin for him (Vaneden Dep. at 80; Vaneden Aff. at 2); however, as noted below, Dr. Gaughan does not mention prescribing any medications in his report from June 2015 (Gaughan 6/17/15 Report at 1-2).  From the records submitted by the plaintiff detailing his treatment with Dr. Gaughan (all of which are unaffirmed, with the exception of the 6/17/15 Report, see infra note 5), it appears that the time last time Dr. Gaughan prescribed Vicodin was October 18, 2012.  (Gaughan 10/18/12 Report at 4).

was also involved in a motor vehicle accident in March 2013, in which he rear-ended another car. (Vaneden Dep. at 90). During the two years that elapsed between the subject accident and Mr. Vaneden's surgery, he testified that he was looking for a surgeon who would accept Medicaid insurance coverage for the procedure, as his no-fault insurance benefits terminated at some point in 2012 or 2013. (Memorandum of Law in Opposition to Linden Defendants' Motion and Satterfield Defendants' Cross-Motion for Summary Judgment Against Vaneden Pursuant to FRCP 56 ("Pl. Opp. Memo.") at 2, 13; Vaneden Dep. at 62-63; Vaneden Aff. at 1).

Mr. Vaneden is 53 years old. He was not working at the time of the March 2012 accident and has not been employed since. (Vaneden Dep. at 8-9). Before the accident, his daily routine consisted of "[n]othing really," and he spent most of his time at home or visiting a friend. (Vaneden Dep. at 91-92; Pl. 56.1, ¶ 10). The plaintiff testified that because of the injuries he sustained in the 2012 accident, he can no longer run, play basketball, enjoy dancing, or "walk for too long." (Vaneden Dep. at 86, 88-89). He also "walk[s] with a limp"; he stated that the accident has "made [his] life incredibly more difficult." (Vaneden Aff. at 2).

B. Medical Reports

1. Ronald P. Grelsamer, M.D.

The Linden defendants' expert orthopedic surgeon, Dr. Grelsamer, conducted a review of Mr. Vaneden's medical records and examined him with respect to his right knee in January 2015. (Def.

56.1, ¶ 13; Affirmed Letter of Ronald Grelsamer, M.D., dated Jan. 28, 2015 ("Grelsamer Report"), attached as part of Exh. T to Kalick Decl., at 1, 4; Affirmed Addendum by Ronald Grelsamer, M.D., dated March 9, 2015 ("Grelsamer Addendum"), attached as part of Exh. T to Kalick Decl., at 1).  Dr. Grelsamer conducted range of motion tests with a protractor on the plaintiff's knees and found a range of "10 to 110 degrees on the right versus 0 to 115 degrees on the left"; he noted that a normal range is 0 to 130 degrees or more. (Grelsamer Report at 4).  Upon examination, Mr. Vaneden demonstrated a "negative Ober sign on the left and a moderately positive Ober sign on the right, indicating a tight ilio-tibial band." (Grelsamer Report at 4).  He was tender around the knee at the joint line and had "nonspecific pain with meniscal maneuvers." (Grelsamer Report at 4-5).  The knee was stable to varus and valgus tests and there was no effusion, increased redness or masses, no skin sensitivity, and no atrophy as measured ten centimeters above the patella.  (Grelsamer Report at 4-5).  During the examination, the plaintiff described pain "at the medial aspect" of his right knee that was brought on by walking for 15 minutes or bending; he did not cite any issues with his left knee.  (Grelsamer Report at 4).  He displayed no acute distress while sitting, standing, and walking, but had a "careful gait."  (Grelsamer Report at 4).

Dr. Grelsamer also reviewed imaging studies of Mr. Vaneden's knees post-dating the subject accident.  Although many of the images were so grainy as to be "non-diagnostic," Dr. Grelsamer noted that a right knee MRI from October 2014 showed the existence

of a "small bone spur" at the lateral aspect of the trochlea and the patella and "non-specific signal changes in the posterior horn of the medial meniscus." (Grelsamer Report at 3). MRI pictures of the same knee from August 2012 demonstrated a moderate effusion and some arthritic changes, as well as signal changes to the meniscus, which also had "multiple focal small lucencies consistent with a degenerative process." (Grelsamer Addendum at 1; Grelsamer Report at 6). Dr. Grelsamer concluded that the August 2012 MRI had no features suggesting trauma and that all the aberrational findings were "common" in an adult male of Mr. Vaneden's age. (Grelsamer Addendum at 1-2).

In discussing the potential relationship of the plaintiff's symptoms and the subject accident, Dr. Grelsamer observed that most meniscal tears result from "wear and tear" and that "a belted passenger in a motor vehicle cannot sustain a tear of the meniscus from hitting the knee against any part of the passenger compartment." (Grelsamer Report at 5). He further opined that a finding of "intermediate grade chondromalacia" -- as noted by the radiologist who conducted Mr. Vaneden's August 2012 right knee MRI -- would indicate "a pre-arthritic condition" unrelated to an accident, and would "not be unusual in a middle-aged man who played basketball." (Grelsamer Report at 5).

2. <u>Mitchell S. Raps, M.D.</u>[4]

Dr. Raps, the Linden defendants' expert neurologist, performed a neurologic examination of the plaintiff in April 2015, and reviewed his medical records with respect to his neck and back. (Def. 56.1, ¶ 14; Letter of Mitchell S. Raps, M.D., dated April 17, 2015 ("Raps Report"), attached as Exh. U to Kalick Decl., at 1). Dr. Raps found that Mr. Vaneden's reported sensory symptoms were "simply non-physiologic" because he reported normal vibration sense throughout his right lower extremity and had intact position sense in his right toes; however, he noted that the plaintiff reported decreased intensity to pinprick sensation on his right leg. (Raps Report at 9).

The plaintiff presented a reduced range of motion in his

---

[4] Dr. Raps did not properly affirm his report, as it is not sworn under penalty of perjury or notarized. <u>See</u> <u>Evans v. United States</u>, 978 F. Supp. 2d 148, 168 (E.D.N.Y. 2013) ("Uncertified medical records and unsworn letters or reports are of no probative value." (quoting <u>Parmisani v. Grasso</u>, 218 A.D.2d 870, 872, 629 N.Y.S.2d 865, 866 (3d Dep't 1995))); <u>Jimenez v. Gubinski</u>, No. 09 Civ. 5645, 2012 WL 279432, at *8 (S.D.N.Y. Jan. 30, 2012) (citing 28 U.S.C. § 1746) (matters may be proved through written statement which is subscribed to be true under penalty of perjury and dated). Although the plaintiff has not raised this issue, because the defendants seek to exclude unaffirmed submissions by the plaintiff on inadmissibility grounds, <u>see</u> <u>infra</u> note 5, I address the impact of Dr. Raps' report on the defendants' evidence out of fairness. Because the defendants meet their prima facie burden of showing the Mr. Vaneden did not sustain a serious injury without the evidence from Dr. Coyne, there is no need to exclude his report. <u>See, e.g.</u> <u>Graves v. L&N Car Service</u>, 87 A.D.3d 878, 879, 931 N.Y.S.2d 550, 550-51 (1st Dep't 2011) (defendants established prima facie case through radiologist's affidavit finding no causal connection between plaintiff's injuries and accident based on examination of plaintiff's MRIs); <u>Bent v. Jackson</u>, 15 A.D.3d 46, 47, 788 N.Y.S.2d 56, 57-58 (1st Dep't 2005); <u>Shaw v. Looking Glass Associates, LP</u>, 8 A.D.3d 100, 101-03, 779 N.Y.S.2d 7, 9-10 (1st Dep't 2004).

cervical spine, neck, and waist. (Raps Report at 9). However, Mr. Vaneden did not complain of spine tenderness when palpated. (Raps Report at 9). Dr. Raps concluded that Mr. Vaneden presented a highly significant reduction in extension, a moderate reduction in bilateral lateral rotation, and a mild degree of reduction to neck flexion, but noted that the mechanical evaluation of range of motion was "entirely subjective in nature." (Raps Report at 9-10). Dr. Raps further noted that the plaintiff's reported ability to climb two flights of stairs to his house and operate a vehicle was "not consistent with an individual who said he was experiencing significant low back pain." (Raps Report at 10).

Although Dr. Raps believed Mr. Vaneden's gait to be at times "exaggerated," he found that some degree of antalgia was present. (Raps Report at 8-9). He formed this belief based on his observation that the plaintiff's gait as he exited Dr. Raps' office was "considerably less antalgic" than the gait presented during the exam. (Raps Report at 9). Dr. Raps opined that Mr. Vaneden was "capable of working." (Raps Report at 10). Finally, Dr. Raps concluded that he saw "no evidence of a neurological disturbance as related to [the subject] accident." (Raps Report at 10).

### 3. Scott S. Coyne, M.D.

The Linden defendants' expert radiologist, Dr. Coyne, reviewed a number of radiology examinations of Mr. Vaneden's spine and knees. (Def. 56.1, ¶ 15; Affirmed Letter of Scott S. Coyne, M.D., dated Feb. 27, 2015 ("Coyne Report"), attached as Exh. V to Kalick Decl., at 1). A July 5, 2012 MRI of the plaintiff's cervical spine

showed "multilevel degenerative disc changes" and "mild degenerative narrowing of the C6-7 neural foramina." (Coyne Report at 1). Dr. Coyne's review of the plaintiff's August 2012 right knee MRI showed tricompartmental degenerative osteoarthritic changes, "extensive degenerative attenuation of the substance of the medial meniscus," and joint effusion. (Coyne Report at 2). An MRI of Mr. Vaneden's lumbosacral spine from August 2012 showed moderately advanced degenerative facet joint changes, advanced degenerative disc changes, and degenerative narrowing of the neural foramina at L4-5. (Coyne Report at 2). Dr. Coyne noted that there was no evidence of focal disc herniation, significant central spinal stenosis, compression, or displacement of the cauda equina at any level. (Coyne Report at 2).

After reviewing an x-ray of the plaintiff's left knee from June 2014, Dr. Coyne found advanced degenerative osteoarthritic changes, and no evidence of acute osseous trauma or joint effusion. (Coyne Report at 2). An x-ray of Mr. Vaneden's right knee from the same date also showed advanced degenerative osteoarthritic changes, unremarkable soft tissues and no joint effusion. (Coyne Report at 3).

A left knee MRI from October 2014 showed prior ACL reconstruction, advanced degnerative joint changes, and degenerative change of the posterior horn of the medial meniscus, but no fracture, dislocation, or contusion. (Coyne Report at 3). Dr. Coyne found that a right knee MRI from October 2014, when compared to the right knee MRI from August 2012 (both of which were

11

also reviewed by Dr. Grelsamer), continued to show tricompartmental degenerative osteoarthritic changes, degenerative attenuation of the posterior horn of the medial meniscus, and mild degenerative splaying of the medial collateral ligament. (Coyne Report at 3). There was no evidence of a medial or lateral meniscus traumatic tear, and the joint effusion had "resorbed." (Coyne Report at 3).

Dr. Coyne's overall impression was that the radiology examinations of Mr. Vaneden's left and right knee demonstrated "advanced degenerative joint changes" and "pronounced degenerative changes of the medial menisci." (Coyne Report at 3). He found that the cervical and lumbosacral spine MRIs showed degenerative disc and facet joint changes and no evidence of acute traumatic injury. (Coyne Report at 3). Additionally, Dr. Coyne observed that all of the degenerative changes of the plaintiff's spine and knees were "certainly chronic, long-standing, pre-existent and not causally related to the March 1, 2012 incident," and that none of the x-rays or MRIs he reviewed showed any "osseous or soft tissue abnormality or other trauma causally related" to the accident. (Coyne Report at 4).

### 4. Jacobi Hospital Records from March 1, 2012

The plaintiff submitted a copy of his records from Jacobi Medical Center regarding his emergency room treatment on March 1, 2012; however, they are not accompanied by a doctor's affirmation. (Treatment Notes of Paul Vaneden dated March 1, 2012 ("Jacobi Records"), attached as Exh. D to Kafko Decl.). From the face of the records, it appears that a scan of Mr. Vaneden's right knee was

taken at Jacobi, and showed possible "suprapatellar bursal distention" and "no visible fracture or dislocation." (Jacobi Records at 12). A CAT scan of his head indicated "unremarkable" soft tissues and osseous structures, and "[n]o definitive acute findings." (Jacobi Records at 13-14). A CAT scan of the plaintiff's cervical spine also taken at Jacobi also revealed unremarkable prevertebral soft tissues and no evidence of fracture or subluxation. (Jacobi Records at 15).

    5. Gerald F. Gaughan, M.D.[5]

    The plaintiff identifies Dr. Gaughan as his "initial treating physician." (Pl. 56.1, ¶ 13). While Dr. Gaughan noted in his affirmed letter that Mr. Vaneden began a course of physical therapy at GFG Medical, where Dr. Gaughan works, on March 28, 2012 (Gaughan 6/17/15 Report at 1), the earliest treatment note submitted by the

---

[5] The plaintiff includes in his submission a number of unaffirmed medical evaluations from Dr. Gaughan, dating from June 21, 2012, to October 18, 2012, as well as a number of treatment records dating from April 18, 2012, to October 8, 2012 (Followup Evaluations and Progress Notes, attached as part of Exh. E to Kafko Decl. at 3-33). As the defendants argue (Reply Memorandum of Law in Further Support of the Linden Defendants' Motion for Summary Judgment against Paul Vaneden ("Linden Reply") at 3), because these reports are not affirmed, they are not competent evidence. See supra note 4; Thomas v. O'Brien, No. 08 CV 3250, 2010 WL 785999, at *7 (E.D.N.Y. Feb. 26, 2010) (finding that while defendant may satisfy initial burden with unsworn reports by plaintiff's physician, plaintiff can only defeat defense motion with sworn affidavits or affirmations substantiating claim of serious injury). Nevertheless, for the sake of completeness, I consider all the submitted records and find that they do not make an appreciable difference to the strength of Mr. Vaneden's objective medical evidence. In other words, the defendants are not prejudiced by inclusion of Dr. Gaughan's unaffirmed reports as the reports are not determinative on the issue of whether the plaintiff sustained a serious injury.

plaintiff is dated April 18, 2012 (Physical Therapy Initial Evaluation dated April 18, 2012, attached as part of Exh. E to Kafko Decl., at 9). Dr. Gaughan further noted that an MRI of Mr. Vaneden's right knee showed "medial and lateral meniscus tears, chondromalacia and effusion," but failed to specify which MRI he was referencing. (Gaughan 6/17/15 Report at 1). As of June 2015, the plaintiff still reported neck pain, spasm, and limitation; back pain radiating to the right thigh and associated right thigh numbness; exacerbation of his previous lumbar condition; pain, limitation, and weakness at the right knee; and joint swelling. (Gaughan 6/17/15 Report at 1). As a result, he reported being limited in his ability to continuously sit, stand, walk, climb stairs, bend, and lift. (Gaughan 6/17/15 Report at 1). Dr. Gaughan also stated that Mr. Vaneden "still uses Vicodin and Flexeril PRN for pain and spasm" but did not identify who, if anyone, had recently prescribed those medications. (Gaughan 6/17/15 Report at 1).

After conducting a physical exam, Dr. Gaughan found that the plaintiff "ambulates with an antalgic gait pattern" favoring his right leg, and noted tenderness and spasm over his cervical paraspinal muscles and tenderness over the medial aspect of the right knee joint. (Gaughan 6/17/15 Report at 1). Range of motion measurements, which were "obtained visually," indicated that Mr. Vaneden had decreased mobility in his neck, trunk, and right knee as demonstrated by constricted flexion, extension, rotation, and

14

lateral bending.[6]  (Gaughan 6/17/15 Report at 1-2).  Dr. Gaughan
also noted "crepitus and clicking" in both knees.  (Gaughan 6/17/15
Report at 2).   A sensory exam was "notable for decreased
sensibility to vibration along the medial aspect of the right
foreleg and foot."  (Gaughan 6/17/15 Report at 2).  Dr. Gaughan's
evaluations from June, July, and October 2012 also show the
plaintiff to have a significantly decreased range of mobility in
his neck and trunk, although his neck flexion, extension, and
rotation showed improved mobility between June and October; the
right knee range remained between 0 and 130 degrees throughout.
(Gaughan 10/18/12 Report at 4; Followup Evaluation of Paul Vaneden
dated July 26, 2012 ("Gaughan 7/26/12 Report"), attached as part of
Exh. E to Kafko Decl., at 5; Physiatric Evaluation of Paul Vaneden
dated June 21, 2012 ("Gaughan 6/21/12 Report"), attached as part of
Exh. E to Kafko Decl., at 7).

Dr. Gaughan's overall assessment was that Mr. Vaneden suffered
from back pain and right thigh numbness due to radiculopathy, right
knee medial and lateral meniscus tears, neck pain, and cervical

---

[6] Mr. Vaneden's neck flexion was 35 degrees (Dr. Gaughan noted
that 50 degrees is normal), extension was 40 degrees (60 degrees is
normal), neck rotation to the right was 30 degrees and to the left
was 45 degrees (normal rotation bilaterally is 90 degrees), and
lateral bending to the right and left was 25 degrees (40 degrees is
normal).  (Gaughan 6/17/15 Report at 1).  Dr. Gaughan found that
trunk flexion was 45 degrees (100 degrees is normal), extension was
10 degrees (30 degrees is normal), lateral bending to the left was
30 degrees and to the right was 20 degrees (40 degrees is normal),
and rotation to left and right was 40 degrees (no information was
provided about the normal range of motion for trunk rotation).
(Gaughan 6/17/15 Report at 2).   The range of motion for the
plaintiff's right knee was 5 to 125 degrees and for the left knee
was 0 to 130 degrees (normal knee flexion is 0 to 150 degrees).
(Gaughan 6/17/15 Report at 2).

disc bulges.  (Gaughan 6/17/15 Report at 2).  He concluded that the above-mentioned conditions were "within a reasonable degree of medical certainty [] the result of injuries which were sustained" in the March 1, 2012 accident.  (Gaughan 6/17/15 Report at 2).  Dr. Gaughan opined that as a result of the accident, the plaintiff had permanent limitations in the mobility of his neck, back, and right knee, and permanent partial loss of use in the same areas. (Gaughan 6/17/15 Report at 2).

   6. <u>Narayan Paruchuri, M.D.</u>

   Dr. Paruchuri, a radiologist, performed an MRI of the plaintiff's right knee in August 2012 due to his knee pain. (Paruchuri MRI Report at 1-2).  He found "a full thickness radial tear of the posterior medial meniscal root," a "horizontal partial thickness undersurface tear of the posterior horn of the medial meniscus measuring 10 mm in length," and "a horizontal undersurface tear of the anterior horn of the lateral meniscus." (Paruchuri MRI Report at 2).  Findings also included "extensive chondromalacia in the medial compartment" and large joint effusion.  (Paruchuri MRI Report at 3).

   7. <u>Ronald Wagner, M.D.</u>

   Dr. Wagner, also a radiologist, conducted an MRI of Mr. Vaneden's lumbar spine in August 2012.  (Wagner MRI Report at 1). He noted the plaintiff's history of back and leg pain.  (Wagner MRI Report at 2).  Findings included disc bulges flattening the ventral thecal sac at T11/12 and L3/4, a broad disc herniation impressing the ventral and ventrolateral thecal sac at L4/5, and a broad

16

subligamentous disc herniation impressing the ventral epidural space at L5/S1. (Pl. 56.1, ¶ 17; Wagner MRI Report at 2).

### 8. Chris Moros, D.O.

Dr. Moros performed arthroscopic surgery on the plaintiff's right knee on March 27, 2014, and affirmed in July 2015 that he continues to provide care to Mr. Vaneden. (Pl. 56.1, ¶¶ 13, 15; Moros Report at 1-2). When Mr. Vaneden first presented to Dr. Moros on February 7, 2014, he complained of "persistent right knee pain;" the pre-operative diagnosis was a right knee medial meniscus tear. (Moros Report at 4, 9). After reviewing an MRI from August 2012, Dr. Moros assessed a right knee sprain with medial and lateral meniscus tears and chondromalcia. (Moros Report at 9). However, the operative report dated March 27, 2014, observed only a tear at the medial meniscus, not the lateral meniscus, and described the arthroscopic procedure as involving "a partial medial meniscetomy" and "a partial synovectomy."[7] (Moros Report at 4).

Dr. Moros noted that an MRI from October 2014, taken because of the plaintiff's left knee pain, showed a medial meniscal tear, previous ACL reconstruction, and "no visualization suggesting [] a recurrent tearing and degenerative tearing." (Moros Report at 2). During a physical exam on June 26, 2015, Dr. Moros found that Mr.

―――――――――――――――

[7] Dr. Moros' June 26, 2015 "[n]arrative [r]eport" describing the plaintiff's March 2014 surgery appears to be at odds with his operative report from March 27, 2014; in the June 2015 report, he wrote that the right knee arthroscopy involved "a partial medial and lateral meniscetomy partial as well as shaved chondroplasty," while in the March 2014 operative report the only mention of the lateral meniscus was to note that it was not torn. (Moros Report at 2, 4).

Vaneden was experiencing mild discomfort and medial joint line tenderness of his right knee; he assessed a medial meniscus tear with synovitis and noted that the injury was "prone to degenerative changes." (Moros Report at 3). Dr. Moros concluded that "with a reasonable degree of medical certainty the right knee injury is causally connected" to the March 1, 2012 accident and that the "limitations are permanent." (Moros Report at 3).

### 9. Mitchell M. Zeren, D.C.[8]

Following the car accident in 2007, Mr. Vaneden saw Dr. Zeren for a number of chiropractic treatments due to his "severe neck and back pain." (Def. 56.1, ¶ 16; Vaneden Dep. at 15; Initial Chiropractic Evaluation by Mitchell M. Zeren, D.C., dated Aug. 30, 2007 ("Zeren Report"), attached as part of Exh. W to Kalick Decl., at 1; Concourse Chiropractic Treatment Records dated Jan. 29, 2015 ("Chiropractic Records"), attached as part of Exh. W to Kalick Decl., at 1-2). At their first meeting, Mr. Vaneden told Dr. Zeren that he was involved in a car accident on August 28, 2007, in which he struck the left side of his body and head on the car door and dashboard and briefly lost consciousness; he was transported by ambulance to Jacobi Hospital and was in and out of consciousness. (Zeren Report at 1). Upon examination, the plaintiff was

---

[8] The defendants have submitted records from the plaintiff's treatment with Dr. Zeren in support of their motion; although Dr. Zeren's report and treatment notes are unsworn, they are properly before the Court as they are "reports by the plaintiff's physicians" submitted by the defendant. Evans, 978 F. Supp. 2d at 163; see also Ebewo v. Martinez, 309 F. Supp. 2d 600, 604 (S.D.N.Y. 2004).

experiencing numbness radiating into his shoulders and arms, and deep left knee and left shoulder pain. (Zeren Report at 1). He also told Dr. Zeren that he injured his left knee in a "sport accident" in 2005. (Zeren Report at 1). Dr. Zeren noted severe tenderness to palpation of Mr. Vaneden's spinal joints and inflammatory changes throughout the cervical spine as well as the thoracic and lumbar spine. (Zeren Report at 1). Range of motion tests revealed a constricted range of motion of the cervical and lumbar spine in terms of flexion, extension, left and right rotation, and left and right lateral flexion.[9] (Zeren Report at 1-2).

Dr. Zeren concluded that the plaintiff had cervical and lumbar spine derangement, traumatic myalgia and myofasciitis, traumatic vertebral subluxation complex, traumatic injury to the left shoulder and left knee, and closed head injury with post-traumatic headaches. (Zeren Report at 2). He further noted that Mr. Vaneden was "totally disabled" and recommended rest and restriction of his activities. (Zeren Report at 2). Dr. Zeren's treatment records show that the plaintiff had over 30 appointments for chiropractic and spinal manipulation between September and December 2007. (Chiropractic Records at 1-2).

---

[9] Dr. Zeren found that the range of motion of Mr. Vaneden's cervical spine showed 30 degrees flexion (he noted 60 degrees is normal), 30 degrees extension (50 degrees is normal), 45 degrees left rotation and 55 degrees right rotation (80 degrees is normal), 20 degrees left lateral flexion, and 30 degrees right lateral flexion (45 degrees is normal). (Zeren Report at 1). His lumbar spine showed 50 degrees flexion (90 is normal), 15 degrees extension (30 degrees is normal), and 15 degrees for left and right lateral flexion (30 is normal). (Zeren Report at 2).

19

10. <u>February 23, 2011 MRI of Lumbar Spine</u>

The defendants also submit a report by Keivan Shifteh, M.D., detailing an MRI examination he conducted on the plaintiff's lumbar spine in February 2011. (February 23, 2011 MRI of Paul Vaneden ("2/23/2011 MRI"), attached as part of Exh. W to Kalick Decl.). Dr. Shifteh found "mild disc bulges" at L3-L4 through L5-S1, a small annular tear at L5-S1, an edema that was "likely secondary to degenerative changes," and a "mild narrowing of the right neuroforamina at L4-L5 with questionable impingement of the right L4 nerve root." (2/23/2011 MRI Report).

B. <u>Procedural History</u>

These two related cases, <u>Kenneth Satterfield v. Jesus M. Maldonado and Linden Yellow Cab, Inc.</u>, No. 14 Civ. 0627, and <u>Paul Vaneden v. Linden Yellow Cab, Inc. and Jesus Maldonado</u>, No. 14 Civ. 3374, were consolidated for all purposes in June 2014 after being removed at different times from New York State Supreme Court based on diversity of citizenship. (Order dated June 25, 2014; Notice of Removal; Notice of Removal ("Vaneden Removal"), <u>Vaneden v. Linden Yellow Cab</u>, No. 14 Civ. 3374 (S.D.N.Y. May 9, 2014)). Subsequently, I issued an order allowing the Linden defendants to file a counterclaim against Kenneth Satterfield and an amended third party complaint against Elma Satterfield, which they did in September 2014. (Memorandum and Order dated Sept. 19, 2014; Counterclaim Against Kenneth Satterfield; Amended Third Party Complaint). Mr. Vaneden then filed an amended complaint against the Linden defendants, Elma Satterfield, and Kenneth Satterfield in

20

January 2015.  (Am. Compl.).

The Linden defendants now move for summary judgment against Mr. Vaneden on the basis that he failed to sustain a serious injury.  (Notice of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 at 1-2).  Mr. Satterfield cross-moves against Mr. Vaneden on the same grounds, seeks dismissal of his complaint with prejudice (Notice of Cross-Motion at 1-2), and incorporates into his cross-motion the Linden defendants' submissions in support of their motion in their entirety[10] (Affirmation of Michael V. DiMartini dated June 16, 2015, ¶¶ 3-4; Defendant Kenneth Satterfield's Declaration of Undisputed Facts Pursuant to Rule 56.1, ¶ 3; Defendant Kenneth Satterfield's Reply Memorandum, ¶ 3).

Applicable Law

A. Legal Standard for Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, a court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Utica Mutual Insurance Co. v. Munich Reinsurance America, Inc., 594 F. App'x 700, 701-02 (2d Cir. 2014).  The moving party bears the initial burden of identifying "the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The opposing party then must cite specific parts of the

---

[10] As Mr. Satterfield has adopted the arguments and submissions of the Linden defendants in seeking summary judgment against Mr. Vaneden, I refer to Mr. Satterfield and the Linden defendants jointly as "the defendants" below.

record, such as depositions, documents, affidavits or declarations, and admissions, to demonstrate the existence of a genuine issue for trial.  Fed. R. Civ. P. 56(c); see also Celotex, 477 U.S. at 324. Only facts that could affect the outcome of the suit under the governing substantive law are deemed "material."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); accord Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 69 (2d Cir. 2001).  In addition, a party may object if the material supporting or disputing a fact cannot be presented in an admissible form.  See Fed. R. Civ. P. 56(c)(2); Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001) ("Affidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial.").  Accordingly, in deciding a summary judgment motion, a court has "broad discretion in choosing whether to admit evidence" and "only admissible evidence need be considered."  Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 65-66 (2d Cir. 1997)).  Where the non-moving party fails to make "a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted.  Celotex, 477 U.S. at 322.

In assessing the record to determine whether there is a genuine issue of material fact for trial, the court must view all facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255 ("The evidence of the non-movant is to be

22

believed, and all justifiable inferences are to be drawn in his favor."); accord Holcomb v. Iona College, 521 F.3d 130, 132 (2d Cir. 2008).  Nonetheless, the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," and may grant summary judgment where the non-movant's evidence is "merely colorable" or not significantly probative.  Anderson, 477 U.S. at 249-50 (internal citations omitted).  In opposing a motion for summary judgment, a party "may not rely on mere speculation or conjecture as to the true nature of the facts", as "conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alteration in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

B. <u>New York's No-Fault Law</u>[11]

The defendants' motion presents me with "the sometimes frustrating task" of deciding whether the plaintiff's alleged injuries meet the threshold requirement of New York's No-Fault Law, "an elusive standard that all too frequently escapes facile and final resolution." <u>Brown v. Achy</u>, 9 A.D.3d 30, 31, 776 N.Y.S.2d 56, 57 (1st Dep't 2004). The No-Fault Law provides for tort recovery for economic loss that exceeds $50,000. N.Y. Ins. Law §§ 5102(a), 5104. The statute encompasses economic losses incurred through medical costs, lost wages, and reasonable and necessary expenses. N.Y. Ins. Law § 5102(a); <u>see also</u> <u>Rookwood v. Valdez</u>, No. 99 Civ. 10285, 2001 WL 776939, at *3 (S.D.N.Y. July 11, 2001).

---

[11] A federal court exercising diversity jurisdiction applies the substantive law of the state in which it is sitting, including that state's conflict of law rules. <u>Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.</u>, 933 F.2d 131, 137 (2d Cir. 1991). "New York applies an 'interest analysis' to its choice of law, under which the law of the jurisdiction having the greatest interest in the litigation controls." <u>Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.</u>, 118 F.3d 955, 967 (2d Cir. 1997).

In a tort case, the significant contacts "are, almost exclusively, the parties' domiciles and the locus of the tort." <u>Schultz v. Boy Scouts of America, Inc.</u>, 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 95 (1985). "Where the parties are domiciled in different states, the locus of the tort will almost always be determinative in cases involving conduct-regulating laws." <u>Krock v. Lipsay</u>, 97 F.3d 640, 646 (2d Cir. 1996); <u>accord</u> <u>Padula v. Lilarn Properties Corp.</u>, 84 N.Y.2d 519, 522, 620 N.Y.S.2d 310, 311 (1994). Negligence law regulates conduct. <u>See</u> <u>In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000</u>, 230 F. Supp. 2d 376, 390 (S.D.N.Y. 2002). Here, Mr. Vaneden is domiciled in New York, the Linden defendants are domiciled in New Jersey, and Mr. Satterfield is presently a resident of Ohio; the accident in question occurred in New York. (Vaneden Removal, ¶ 3; Am. Compl., ¶¶ 2-4). Consequently, New York law governs the claims in this case.

The underlying purpose of the No-Fault Law is "to weed out frivolous claims and limit recovery to significant injuries." Dufel v. Green, 84 N.Y.2d 795, 798, 622 N.Y.S.2d 900, 902 (1995); accord Toure v. Avis Rent A Car Systems, Inc., 98 N.Y.2d 345, 350, 746 N.Y.S.2d 865, 867-68 (2002); see also Licari v. Elliott, 57 N.Y.2d 230, 234-35, 455 N.Y.S.2d 570, 572 (1982). Accordingly, the statute restricts recovery for automobile accidents as follows:

> Notwithstanding any other law, in any action by or on behalf of a covered person against another covered person for personal injuries arising out of negligence in the use or operation of a motor vehicle in this state, there shall be no right of recovery for non-economic loss, except in the case of a serious injury, or for basic economic loss.

N.Y. Ins. Law § 5104(a). Serious injury, in turn, is defined in relevant part as:

> [A] personal injury which results in . . . permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

N.Y. Ins. Law § 5102(d).

Where a claim involves non-economic loss, as here, a defendant moving for summary judgment has the initial burden of putting forward evidence showing that the plaintiff has not sustained a serious injury within the meaning of the No-Fault Law. Evans, 978 F. Supp. 2d at 162-63. "The defendant may satisfy this initial burden with unsworn reports by the plaintiff's physicians or with

sworn affidavits or affirmations by the defendant's own retained physicians." Id. at 163 (quoting Thomas, 2010 WL 785999, at *7). If the defendant makes such a prima facie showing, the burden shifts to the plaintiff to "defeat the motion by submitting sworn affidavits or affirmations by [his] physicians that support [his] claim of serious injury." Id. (quoting Mueller v. Seatainer Transport, Ltd., 816 F. Supp. 2d 206, 210-11 (W.D.N.Y. 2011)).

To properly demonstrate a "serious injury," a plaintiff must provide "objective proof of [his] injury," as "subjective complaints alone are not sufficient." Toure, 98 N.Y.2d at 350, 746 N.Y.S.2d at 868. However, in Pommells v. Perez, the New York Court of Appeals held that even where a plaintiff offers objective medical proof of a serious injury, "when additional contributory factors interrupt the chain of causation between the accident and claimed injury -- such as a gap in treatment, an intervening medical problem or a preexisting condition -- summary dismissal of the complaint may be appropriate." 4 N.Y.3d 566, 572, 797 N.Y.S.2d 380, 383 (2005).

Mr. Vaneden argues that he sustained injuries causally related to the subject accident that pass the threshold test, as he suffered both a permanent consequential limitation of use of a body organ or member, and a significant limitation of use of a body function or system. (Pl. Opp. Memo. at 8-13).

Discussion

The defendants have made a prima facie showing that the plaintiff did not sustain a serious injury to his back, neck, and

26

right knee within the meaning of the No-Fault Law.  See Jimenez, 2012 WL 279432, at *7-8 (collecting cases); Shaw, 8 A.D.3d at 102-03, 779 N.Y.S.2d at 10.  The defendants' expert orthopedic surgeon, Dr. Grelsamer, examined Mr. Vaneden and reviewed his medical records, and determined that the plaintiff did not sustain a meniscal tear as a result of the March 1, 2012 accident and did not demonstrate acute distress while standing or walking.  (Grelsamer Report at 1-5).  The defendants' expert radiologist, Dr. Coyne, evaluated the plaintiff's MRIs and x-rays, and found that his knees demonstrated advanced degenerative changes, his cervical and lumbosacral spine showed degenerative changes, and all of the degenerative changes of his spine and knees were chronic, long-standing, pre-existent, and not causally related to the subject accident.  (Coyne Report at 3-4).  The defendants also submitted medical records from chiropractic treatment Mr. Vaneden received in 2007, which labeled him "totally disabled" and found his range of motion to be markedly constricted.  (Zeren Report at 1-2).  Lastly, the defendants proffered an MRI of the plaintiff's lumbar spine pre-dating the accident that also demonstrated degenerative changes.  (2/23/2011 MRI Report).

    A. Permanent Consequential Limitation of Use

    "To prove permanence, 'it is not necessary to prove a total loss of the affected function or system, but it is still necessary to submit proof that it operates in some limited way, or operates only with pain.'"  Baytsayeva v. Shapiro, 868 F. Supp. 2d 6, 21 (E.D.N.Y. 2012) (quoting Booker v. Miller, 258 A.D.2d 783, 784, 685

N.Y.S.2d 837, 837 (3d Dep't 1999)); see also Barth v. Harris, No. 00 Civ. 1658, 2001 WL 736802, at *11 (S.D.N.Y. June 25, 2001) (injury causing permanent but intermittent pain may qualify if "more than minor or involv[ing] at least some restriction of motion" or actual limitation of use) (collecting cases).    A plaintiff must also "produce competent medical evidence that [his] injuries are permanent." Ventra v. United States, 121 F. Supp. 2d 326, 333 (S.D.N.Y. 2000).   The absence of a recent medical examination purporting to substantiate "that portion of a plaintiff's serious injury claim which alleges some sort of permanent or significant injury . . . . leaves an important evidentiary vacuum in a plaintiff's opposition to a motion for summary judgment." Baytsayeva, 868 F. Supp. 2d at 21 (internal citation omitted).

Mr. Vaneden alleges that his neck, back, and right knee impairments constitute a "permanent disability" as required to establish a "serious injury." (Pl. Opp. Memo. at 11).   In furtherance of this argument, the plaintiff cites Dr. Gaughan's findings from a June 2015 physical exam that Mr. Vaneden continued to exhibit an antalgic gait, right knee tenderness, decreased sensibility to vibration along the right foot, and a reduced range of motion in his neck, back, and right knee. (Pl. Opp. Memo. at 9; Gaughan 6/17/15 Report at 1-2).   He also relies on Dr. Moros' opinion that the limitations related to his right knee meniscus tear are permanent. (Pl. Opp. Memo. at 9-10; Moros Report at 2-3). Additionally, in his deposition, Mr. Vaneden complained of

intermittent "stabbing pain" in his right knee, and neck and lower back pain, causing him to continue taking Vicodin. The "limitations" he experiences include an inability to run, play basketball, or walk for long periods of time, all as a result of the injuries he sustained in the March 1, 2012 accident. (Vaneden Dep. at 76-77, 79-80, 86-87).

Of course, "[p]ermanent injuries already in existence at the time of the car accident will not qualify" as serious injuries. Jones v. United States, 408 F. Supp. 2d 107, 117 (E.D.N.Y. 2006) (collecting cases). In Mr. Vaneden's case, records demonstrate pre-existing conditions affecting his neck and spine. In particular, notes from his 2006 treatment with Dr. Zeren discuss a constricted range of motion of his cervical and lumbar spine, tenderness, and inflammatory changes throughout the cervical, thoracic, and lumbar spine. (Zeren Report at 1-2). Mr. Vaneden was diagnosed with, among other things, cervical and lumbar spine derangement, traumatic vertebral subluxation complex, and a closed head injury, and was labeled "totally disabled." (Zeren Report at 2). Additionally, an MRI of his lumbar spine from February 2011 showed mild disc bulges at various vertebral segments and degenerative disc desiccation. (2/23/2011 MRI Report).

The plaintiff has not provided any expert report that explains why these pre-existing conditions are not the cause of his current injuries. Cf. Wadford v. Gruz, 35 A.D.3d 258, 259, 826 N.Y.S.2d 57, 59 (1st Dep't 2006) (plaintiff's expert noted prior accident and documented differences between MRI taken after earlier accident

and after subject accident before concluding that injuries resulted from the latter); see also Hayes v. Johnston, 17 A.D.3d 853, 853-54, 794 N.Y.S.2d 462, 463 (3d Dep't 2005) (granting summary judgment where plaintiff failed to present objective evidence to counter testimony of defendant's expert that plaintiff's degenerative disc disease and mild disc bulging predated the accident). Morever, Mr. Vaneden did not provide meaningful evidence addressing Dr. Coyne's findings that July 2012 and August 2012 MRIs of the plaintiff's cervical and lumbosacral spine showed "degenerative disc and facet joint changes" and that all such changes were "long-standing . . . and not causally related" to the March 1, 2012 accident. (Coyne Report at 3-4). Dr. Gaughan's statement that the plaintiff's back pain was "the result of injuries" sustained in the accident (Gaughan 6/17/15 Report at 2) is unsupported by objective testing. See Arroyo v. Morris, 85 A.D.3d 679, 680, 926 N.Y.S.2d 488, 489-90 (1st Dep't 2011) (experts' failure to reference either plaintiff's degenerative or chronic condition made their opinion on causation "speculative"); Rogers v. Chiarelli, 10 A.D.3d 355, 356, 781 N.Y.S.2d 368, 368-69 (2d Dep't 2004) (summary judgment appropriate where plaintiff's expert failed to account for injuries to neck and back prior to accident). Therefore, as to his neck and back conditions, Mr. Vaneden has not provided sufficient medical evidence to support his claim of a serious injury causally related to the March 1, 2012 accident.

As for the plaintiff's other conditions, the defendants argue

that the gap in his treatment is fatal to his serious injury claim. (Memorandum of Law in Support of the Linden Defendants' Motion for Summary Judgment against Paul Vaneden Pursuant to FRCP 56 at 22; Linden Reply at 8-9).   "While a cessation of treatment is not dispositive . . . a plaintiff who terminates therapeutic measures following the accident . . . must offer some reasonable explanation for having done so." Pommells, 4 N.Y.3d at 574, 797 N.Y.S.2d at 385.   Mr. Vaneden contends that discontinuation of benefits constitutes such an explanation. (Pl. Opp. Memo. at 13-14).   This is certainly true, see Peluso v. Janice Taxi Co., 77 A.D.3d 491, 492, 909 N.Y.S.2d 699, 700 (1st Dep't 2010); Wadford, 35 A.D.3d at 259, 826 N.Y.S.2d at 59; however, even in the case that Mr. Vaneden cites in support of this proposition, the plaintiff "offer[ed] proof of the termination of her insurance benefits" in addition to her testimony that she could not afford to pay for treatment "out of pocket." Peluso, 77 A.D.3d at 492, 909 N.Y.S.2d at 700.

In the instant case, not only has Mr. Vaneden not provided any proof that he was "treated until No-Fault would not pay for further therapy and finally had surgery after finding a doctor who would accept Medicaid," he does not even provide a date on which his no-fault coverage ended, state that his financial situation prevented further treatment, or describe in any detail his search for a surgeon who accepted alternative insurance. (Pl. Opp. Memo. at 10).   Consequently, the plaintiff has not sufficiently explained the sixteen-month gap in treatment between October 2012, when the record indicates he last saw Dr. Gaughan for physical therapy

31

relating to his low back, neck, and right knee, and February 2014, when he first consulted with Dr. Moros in advance of knee surgery. (Gaughan 10/18/12 Report at 4; Moros Report at 4).   As the defendants highlight, the record also indicates an unexplained gap in treatment between May 2014 and June 2015, when the plaintiff obtained affirmed reports from Dr. Gaughan and Dr. Moros in order to oppose the defendants' motion.   (Linden Reply at 8-9).   Dr. Moros' report from June 2015 states that Mr. Vaneden received a corticosteroid injection in his right knee on May 6, 2014 (Moros Report at 2); there is no proof of subsequent medical treatment for that knee and Mr. Vaneden testified that he has not undertaken any physical therapy in 2015 (Pl. 56.1, ¶ 9).

Additionally, although both Dr. Moros and Dr. Gaughan opined that the right knee limitations resulting from the March 1, 2012 accident are "permanent," there are no recent objective examinations supporting that conclusion.  See Jones, 408 F. Supp. 2d at 117 (a claim of permanent limitation "must be supported by medical records, and not based solely on plaintiff's testimony and subjective descriptions of pain").  In fact, Dr. Coyne found that an October 2014 MRI of Mr. Vaneden's right knee showed degenerative changes, no evidence of a meniscus traumatic tear, and resorbed joint effusion; he also concluded that none of the MRIs or x-rays he reviewed showed any "osseous or soft tissue abnormality" related to the accident.  (Coyne Report at 3-4). In light of the plaintiff's unproven and unexplained gaps in treatment and his failure to bolster his claim of permanent injuries with objective

proof, the plaintiff has cannot establish a permanent consequential limitation of use as to his right knee.

B. Significant Limitation of Use

A "significant limitation of use of a body function does not require permanence, but instead requires a fact finding on the issue of whether the dysfunction is important enough to reach the level of significance." Jones, 408 F. Supp. 2d at 119 (quoting Miller v. Miller, 100 A.D.2d 577, 578, 473 N.Y.S.2d 513, 514 (2d Dep't 1984). The New York Court of Appeals has held that a "minor, mild or slight limitation of use" of a body function or system does not constitute a "significant limitation." Licari, 57 N.Y.2d at 236, 455 N.Y.S.2d at 573; accord Baytsayeva, 868 F. Supp. 2d at 22. As with permanent consequential limitations, claims of serious injuries based on the significance of a plaintiff's limitation must be supported by objectively measured and credible medical evidence. Ventra, 121 F. Supp. 2d at 333-34; Jones, 408 F. Supp. 2d at 119. "A plaintiff's description of his pain and suffering, standing alone without other objective indicia, cannot support a claim of significant limitation." Jones, 408 F. Supp. 2d at 119. Additionally, a plaintiff must prove a significant limitation "in both degree and duration." Gualtieri v. Farina, 283 F. Supp. 2d 917, 925 (S.D.N.Y. 2003); accord Partlow v. Meehan, 155 A.D.2d 647, 648, 548 N.Y.S.2d 239, 240 (2d Dep't 1989).

In Toure, the New York Court of Appeals noted that "an expert's designation of a numeric percentage of a plaintiff's loss of range of motion can be used" to prove the extent of a physical

limitation and "substantiate a claim of serious injury." 98 N.Y.2d
at 350, 746 N.Y.S.2d at 868; accord Baytsayeva, 868 F. Supp. 2d at
23. A doctor's "qualitative assessment of a plaintiff's condition
also may suffice, provided that the evaluation has an objective
basis and compares the plaintiff's limitations to the normal
function, purpose and use of the affected body organ, member,
function or system." Toure, 98 N.Y.2d at 350-51, 746 N.Y.S.2d at
868; accord Carter v. Atlantic Greyhound Lines of VA, Inc., No. 02
CV 0393, 2005 WL 1692639, at *6 (E.D.N.Y. July 5, 2005). A
significant limitation is often demonstrated through an injury's
impact on a plaintiff's range of motion. Jones, 408 F. Supp. 2d at
121. Whether a limitation of use qualifies as significant
"involves a comparative determination . . . based on the normal
function, purpose and use of the body part." Toure, 98 N.Y.2d at
353, 746 N.Y.S.2d at 869 (quoting Dufel, 84 N.Y.2d at 798, 622
N.Y.S.2d at 902). Additionally, "[w]hile there is no set
percentage for determining whether a limitation in range of motion
is sufficient to establish 'serious injury,' the cases have
generally found that a limitation of twenty percent or more is
significant for summary judgment purposes." Hodder v. United
States, 328 F. Supp. 2d 335, 356 (E.D.N.Y. 2004) (collecting
cases).

Mr. Vaneden argues his range of motion, which was constricted
"immediately following the accident" and remains constricted, is
"clear evidence" that he sustained a signficant limitation under
the No-Fault Law. (Pl. Opp. Memo. at 13). Although Dr. Gaughan's

reports pre-dating June 2015 do indicate that the plaintiff experienced a restricted range of motion in the months following the March 1, 2012 accident, Dr. Gaughan fails to ascribe  any limitations to his decreased mobility. (Gaughan 6/21/12 Report at 7-8; Gaughan 7/26/12 Report at 5-6; Gaughan 10/18/12 Report at 3-4). As for the plaintiff's current range of motion, testing by Dr. Gaughan and the defendants' expert Dr. Grelsamer confirm that he has experienced a considerable loss of mobility. (Gaughan 6/17/15 Report at 1-2; Grelsamer Report at 4).   Notwithstanding the quantitative measurement, there is also no explanation of actual or specific limitations resulting from his decreased mobility; Dr. Gaughan described only vague "permanent limitations [] in the mobility of the neck, back and right knee." (Gaughan Report at 2); see Bent, 15 A.D.3d at 49-50, 788 N.Y.S.2d at 59 (expert's statement that plaintiff's limited range of motion affected his daily life and caused functional disability conclusory and failed to raise genuine isse of fact); Hemmes v. Twedt, 180 A.D.2d 925, 926, 580 N.Y.S.2d 510, 511 (3d Dep't 1992) (upholding summary judgment in part because plaintiff's expert made no mention of any activities plaintiffs would be unable to perform due to limitations).

Moreover, there is no objective evidence demonstrating constricted mobility. This is particularly problematic because, as the court noted in Jones, diagnoses regarding range of motion are often based on subjective tests "in which the plaintiff had some or total control over his range of motion." 408 F. Supp. 2d at 121-22

(discrediting range of motion testimony where plaintiff had control over his range of motion and MRIs did not show further aggravation of degenerations and injuries); cf. Baytsayeva, 868 F. Supp. 2d at 23 (denying summary judgment where plaintiff submitted three sworn affidavits diagnosing her with conditions related to traumatic brain injury and near-constant and severe pain throughout her body, MRIs showing disc herniation and bulging, and recent range of motion testing showing significant limitations). Because "New York courts have consistently held" that a finding of loss of range of motion "is insufficient to support an objective finding of serious injury" without additional supportive evidence, Hodder, 328 F. Supp. 2d at 349 (quoting Gillick v. Knightes, 279 A.D.2d 752, 752, 719 N.Y.S.2d 335, 336 (3d Dep't 2001)), Mr. Vaneden's claim of a serious injury based on constricted range of motion fails.

The plaintiff also relies on his continued use of a knee brace, antalgic gait pattern, and tenderness over his cervical paraspinal muscles and right knee joint as constituting a significant limitation. (Pl. Opp. Memo. at 12-13). However, the plaintiff's own expert Dr. Moros found in a June 2015 physical exam that he was only experiencing "mild discomfort" in the right knee (Moros Report at 3) and, as discussed above, mild limitations are classified as insignificant under the No-Fault Law, see Jimenez, 2012 WL 279432, at *9; Licari, 57 N.Y.2d at 236, 455 N.Y.S.2d at 573. As for Mr. Vaneden's neck and back pain, the same issues that prevent him from establishing a permanent limitation -- causation and pre-existent injuries from his 2007 car accident -- also bar

him from claiming a significant one.  Perhaps most pertinently, the limitations described by Mr. Vaneden do not on their face rise to the level of "significant."  The plaintiff argues that he can no longer run, play basketball, enjoy dancing, or walk too long.  (Pl. Opp. Memo. at 12).  However, inability to fully participate in recreational activities does not qualify as a significant limitation.  See Cooper v. Dunn, No. 99 CV 6903, 2001 WL 138864, at *11 (E.D.N.Y. Jan. 2, 2001).  Furthermore, Mr. Vaneden's subjective description of relatively mild limitations, unsupported by objective medical evidence, is insufficient to raise an issue of fact.  See Thompson v. Abbasi, 15 A.D.3d 95, 101, 788 N.Y.S.2d 48, 53 (1st Dep't 2005); Sellitto v. Casey, 268 A.D.2d 753, 755, 702 N.Y.S.2d 177, 180 (3d Dep't 2000) (psychologist's description of plaintiff's limitations did not "provide that objectively measure quantum of evidence necessary to satisfy" significant limitiation category); cf. Toure, 98 N.Y.2d at 353, 746 N.Y.S.2d at 870 (limitations significant where physician specifically attributed plaintiff's difficulty in sitting, standing, walking, and lifting heavy boxes at work to injuries).

The plaintiff has not submitted evidence demonstrating that he suffered a "severe injury" under either the permanent consequential limitation of use or significant limitation of use categories of New York Insurance Law § 5102(d), and there is accordingly no genuine issue of material fact to preclude summary judgment in favor of the defendants.

Conclusion

For the reasons set forth above, the Linden defendants' motion for summary judgment (Dkt. No. 53) and Mr. Satterfield's cross motion (Dkt. No. 62) are granted. Counsel shall submit a joint pretrial order with respect to Mr. Satterfield's claims by September 30, 2015.

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       August 31, 2015

Copies transmitted this date:

Nicholas Warywoda, Esq.
Parker Waichman LLP
6 Harbor Park Dr.
Port Washington, NY 11050

Neil R. Kafko, Esq.
Kafko Schnitzer, LLP
7 Hugh J. Grant Circle
Bronx, NY 10462

Lindsay J. Kalick, Esq.
Wilson Elser Moskowitz Edelman & Dicker LLP
1133 Westchester Ave.
White Plains, NY 10604

Eugene T. Boulé, Esq.
Wilson Elser Moskowitz Edelman & Dicker LLP
677 Broadway
Albany, NY 12207

Michael V. DiMartini, Esq.
Law Offices of Cohen & Kuhn
100 Williams Street, Suite 920
New York, NY 10038